

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00044-CV

K.T.                                                                        APPELLANT

V.

M.T.                                                                        APPELLEE

----------

### FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY
### TRIAL COURT NO. 31091

----------

## MEMORANDUM OPINION[1]

----------

This is an appeal from a November 13, 2013 final decree in a divorce and suit affecting the parent-child relationship (SAPCR). In seven issues, appellant (Wife) contends that the judgment should be reversed because (1) the trial court abused its discretion by limiting periods of access to and possession of her minor

---

[1]*See* Tex. R. App. P. 47.4.

daughter (Tammy)[2] to only two supervised weekends per month (first issue), (2) the trial court abused its discretion in the property division by excluding commercial goodwill from appellee Husband's business, awarding the entire value of Husband's community property deferred compensation account to Husband, resulting in an unfair and unjust property division (second through fourth issues), (3) the trial court abused its discretion by limiting the amount of spousal maintenance paid by Husband to Wife to only $1,250 per month for one year while at the same time ordering Wife to pay child support of $262.88 per month (fifth and sixth issues), and (4) the presiding regional administrative judge should have granted Wife's motion to recuse visiting judge David Cleveland, who presided over much of the pretrial proceedings and the trial (seventh issue). We affirm in part and reverse and remand in part.

**Procedural Background**

This case has a lengthy, contentious history, which we need not recite in detail. Husband and Wife married in March 1995; had two children, Lauren and Tammy; and separated in March 2010. Husband filed for divorce in April 2010 and Wife filed a counterpetition. Both Lauren and Tammy attended counseling during the pendency of the divorce and SAPCR proceedings. The trial court signed a final decree in November 2013.

---

[2]In accordance with Rule 9.8, we refer to children using pseudonyms. Tex. R. App. P. 9.8 cmt.

## Motion to Recuse

In December 2013, almost one month after Judge Cleveland signed the final decree, Wife filed a motion to recuse him from making further rulings in the case. In the motion, she alleged the following:

> The impartiality of JUDGE DAVID CLEVELAND might reasonably be questioned, in that in prior proceedings [sic]. Initially, on the record, *April 17, 2012*, Judge Cleveland made the following statement after making his ruling against [Wife's] request for Contempt: "God bless you [Husband]." Later in further proceedings off the record, [Wife] has information regarding other communications made by Judge Cleveland which would suggest the bias and /or prejudice concerning the subject matter of the suit and the parties. Such statements and communications rise to the level of mandatory recusal under TRCP 18b (b) both (1) &(2). [Emphasis added.]

Judge Cleveland declined to recuse himself and referred the matter to Judge Jeff Walker, the then Presiding Judge of the 8th Administrative Judicial Region. Judge Walker denied the recusal motion after a hearing.

Two days later, Wife filed a second motion to recuse based on bias, complaining of additional statements Judge Cleveland allegedly made during the final trial in June 2013.[3] Wife attached affidavits to her motion and asked for a hearing if Judge Cleveland declined to recuse himself. She filed a motion for new trial the same day, in which she also raised, among other matters, the same

---

[3]Judge Walker had pointed out to Wife's counsel at the hearing on the first motion to recuse that the only statement referenced with specificity, as required in rule 18a(a)(4), is the "God bless you" statement and that he would not hear any evidence regarding other statements not mentioned specifically in the verified motion to recuse. Tex. R. Civ. P. 18a(a)(4). Judge Walker also denied Wife's oral motion to file an amended motion to recuse.

3

bias and impartiality issues that she had raised in her recusal motions. Once again, Judge Cleveland declined to recuse himself from the case and referred the matter to Judge Jeff Walker. After a hearing, Judge Walker denied the second motion.

We review an order denying a motion to recuse for an abuse of discretion. *See* Tex. R. Civ. P. 18a(j)(1)(A); *In re S.D.*, No. 02-10-00221-CV, 2011 WL 3847440, at *5 (Tex. App.—Fort Worth Aug. 31, 2011, no pet.) (mem. op.). Complaints that concern recusal can be waived if the party seeking recusal fails to file an appropriate motion within the time required by rule 18a(b)(1). Tex. R. Civ. P. 18a(b)(1); *see, e.g.*, *Vickery v. Tex. Carpet Co.*, 792 S.W.2d 759, 763 (Tex. App.—Houston [14th Dist.] 1990, writ denied). To be timely, a motion to recuse must be filed "as soon as practicable after the movant knows of the ground stated in the motion" and no later than "the tenth day before the date set for trial or other hearing unless, before that day, the movant neither knew nor reasonably should have known . . . (i) that the judge whose recusal is sought would preside at the trial or hearing . . . or (ii) that the ground stated in the motion existed." Tex. R. Civ. P. 18a(b)(1).

At the hearing on the first motion to recuse, Wife testified that she was "blown away" when she heard Judge Cleveland say "God bless you" to Husband, and her former attorney testified that he had never seen a judge say that to a litigant during thirty-one years of legal practice, especially given that Husband had violated a temporary order regarding Wife's access to and possession of the

4

children.[4]  They both said they thought that Judge Cleveland's remark clearly indicated bias against Wife.[5]  Yet Wife waited over a year and a half after the April 2012 hearing when the remark was made—until after Judge Cleveland had presided over a final hearing and signed a decree—to file her first motion to recuse.  If, as Wife and her attorney argue, Judge Cleveland's comment clearly indicated bias, such bias was known to them in April 2012, and her December 2013 motion to recuse was therefore untimely.

Likewise, Wife's second motion for recusal was based on Judge Cleveland's comments and actions during the June 2013 final hearing upon which the November 2013 decree was based.[6]  Much of the testimony focused on the fact that Judge Cleveland made rulings adverse to Wife.  Accordingly, these facts were known to Wife months before the trial court signed the final decree.  We conclude and hold that Wife's second motion to recuse was also untimely.  Because both motions were untimely under rule 18a(b)(1), Judge

---

[4]The trial court had found that Husband's failure to comply was excused by Wife's recent behavior, which had created an "immediate concern" for the children's welfare.

[5]According to Wife, "I don't see how anyone that was in the courtroom could think he had not had a bias or a prejudice by the way he said, how he looked to him, and what he said."

[6]Although Wife testified that she knew Husband had been videotaped by police officers stating that Judge Cleveland did not like her "at all," and that in a criminal or a children's case, "You can chalk one up in the win column.  He's hard core," these statements reveal only Husband's personal opinion and not any opinion of Judge Cleveland's.

Walker did not abuse his discretion by denying them.[7] *See, e.g., Holland v. Friedman & Feiger*, No. 05-12-01714-CV, 2014 WL 6778394, at *10 (Tex. App.—Dallas Dec. 2, 2014, pet. filed) (mem. op.); *Henry v. Henry*, No. 03-11-00253-CV, 2014 WL 1572478, at *4 (Tex. App.—Austin Apr. 18, 2014, no pet.) (mem. op.); *Parker v. Textron Fin. Corp.*, No. 04-12-00564-CV, 2013 WL 979208, at *2 (Tex. App.—San Antonio Mar. 13, 2013, no pet.) (mem. op.); *Newby v. Uhl*, No. 02-10-00466-CV, 2012 WL 3115628, at *4 (Tex. App.—Fort Worth Aug. 2, 2012, no pet.) (mem. op.). We overrule Wife's seventh issue.

### Limited Visitation

In her first issue, Wife contends that the trial court erred by limiting her visitation with Tammy[8] to only two supervised weekends per month. Although Wife complains on appeal about the trial court's deviation from the standard possession order, Wife's counsel did not object when Husband's counsel told the trial judge at the beginning of the final trial that the parties had stipulated to joint conservatorship with Husband having the primary right to determine the

---

[7]Moreover, the motions were both based exclusively on Judge Cleveland's remarks during the proceedings. Judicial remarks, even those that are critical or disapproving of, or even hostile to, parties or their cases, do not ordinarily support a bias or partiality challenge. *Drake v. Walker*, No. 05-14-00355-CV, 2015 WL 2160565, at *5 (Tex. App.—Dallas May 8, 2015, no pet.) (mem. op.); *Hansen v. JP Morgan Chase Bank, N.A.*, 346 S.W.3d 769, 776 (Tex. App.—Dallas 2011, no pet.).

[8]Although Lauren was still a minor when the decree was signed, she turned eighteen during this appeal; therefore, Wife challenged the trial court's order only as to visitation with Tammy.

6

residence of the children, with the only dispute being "whether it [visitation] should *continue to be* supervised or not supervised." [Emphasis added.] Therefore, we will address whether the trial court abused its discretion by ordering supervised visitation.

Husband contends that the provisions regarding possession and access in the decree are now moot because of the trial court's ruling on a subsequently filed motion to modify. But in light of the fact that we have reversed the modification order in an opinion issued today in cause number 02-14-00339-CV, we address the trial court's ruling. *See, e.g.*, *Sultan v. Mathew*, 178 S.W.3d 747, 751 (Tex. 2005) (noting that judgment can be described as "final" when trial or appellate court power to alter it ends).

**Standard of Review**

We review the trial court's decisions on custody, control, possession, and visitation matters for an abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Newell v. Newell*, 349 S.W.3d 717, 720 (Tex. App.—Fort Worth 2011, no pet.). Legal and factual sufficiency are not independent grounds of error in this context, but they are relevant factors in deciding whether the trial court abused its discretion. *Ruiz v. Ruiz*, No. 02-12-00136-CV, 2013 WL 530958, at *2 (Tex. App.—Fort Worth Feb. 14, 2013, no pet.) (mem. op.); *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g). In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision,

7

we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion. *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.); *T.D.C.*, 91 S.W.3d at 872. The traditional sufficiency review is involved in answering the first question and whether the trial court made a reasonable decision in answering the second. *M.M.M.*, 307 S.W.3d at 849.

The best interest of the child must always be the primary consideration in determining the issues of conservatorship and possession of and access to the child. Tex. Fam. Code Ann. § 153.002 (West 2014); *Ruiz*, 2013 WL 530958, at *2; *see Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing nonexhaustive factors that court may use to determine best interest).

In her argument, Wife contrasts Judge Cleveland's ruling with a prior temporary orders ruling in 2011 by the presiding judge of the trial court allowing Wife limited unsupervised visitation with both children upon what Wife claims is much of the same evidence as that underlying the 2012 temporary orders and 2013 decree. Because temporary orders are not appealable, however, we will consider only the evidence at the final trial upon which the decree is based. *See, e.g., In re J.W.L.*, 291 S.W.3d 79, 83 (Tex. App.—Fort Worth 2009, orig. proceeding [mand. denied]).

**Applicable Law**

A trial court may limit the rights and duties of a parent appointed as a conservator upon a finding that such a limitation is in the child's best interest.

8

Tex. Fam. Code Ann. § 153.072 (West 2014). Additionally, a trial court need not award joint managing conservators "equal or nearly equal periods of physical possession of and access to the child." *Id.* § 153.135 (West 2014). But an order that imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed terms that are required to protect the best interests of the child. *Id.* § 153.193 (West 2014); *Newell*, 349 S.W.3d at 721.

**Record Supports Trial Court's Findings on Supervised Visitation**

We have reviewed and considered the entire record of the final trial. The trial court admitted credible evidence that before and during the divorce proceedings, Wife misused prescription medication and that she regularly engaged in erratic behavior around and toward both Lauren and Tammy.[9] There is competent evidence that Lauren had described Wife as being "high" around her more than once and that at one visit by herself, Tammy could not wake Wife up and texted Husband that Wife was passed out but not dead. Likewise, there is credible evidence that Lauren's and Tammy's psychological issues, such as severe anxiety and depression, improved over the course of their treatment by a child psychologist from 2010 to 2013 and that they both improved further after

---

[9]For instance, the trial court admitted numerous pages of text messages between the children and Wife into evidence; many of those messages show the strained relationship between Wife and the girls, along with Wife's sometimes manipulative and erratic behavior toward them. There was testimony that Lauren had received a text message from Wife that Lauren perceived as threatening suicide, which greatly affected her emotionally.

the trial court ordered supervised visitation in 2012. Husband testified that Wife was more attentive to and engaged with Tammy during the supervised visits.

Wife contends that the evidence shows that she had not used opioids since March 2013, that psychological testing of her showed no "indications of violence, thought disorder, suicidal tendencies, substance abuse, cognitive dysfunction, or illegal behavior," and that her personal physician never thought she had been a drug addict and thought there were no concerns about her driving even when she was taking opioids. It is undisputed that during the marriage, Wife was diagnosed with several complicated autoimmune diseases for which she receives treatment from numerous doctors and suffers from chronic pain. However, the evidence that she had not taken opioids since March 2013—three months before the final trial—came from her own testimony, and in other parts of her testimony, she was evasive, particularly when asked about how the former marital residence was left in serious disarray after she moved out.[10] The trial court could have determined that her unwillingness to answer certain questions reflected negatively on her credibility.

Additionally, on cross-examination, the psychologist who performed testing on Wife admitted that she had not seen any of the physician letters in which doctors had expressed concern that Wife was misusing prescription drugs.

---

[10]She also had no explanation about a marijuana pipe that Husband found under the bed, along with keys and a garage door opener for his new residence. Husband and the daughters had already moved out of the former marital residence, and Wife had been living there alone except when she had visitation.

10

Although the psychologist did not waver from her testimony that Wife's answers on the testing indicated she was being truthful and did not have an addiction, she admitted that the test could only be considered valid during the time frame around which it was administered, which was within six months of the test date. The test date was almost a year before trial.

Contrary to Wife's assertion, her long-term family physician testified that the evidence indicated to him that she did have an ongoing addiction to pain medication, which would cause her to be less functional. Although on cross-examination he admitted that he had never discussed the issue of addiction with her directly and that his medical records for her contained no references to addiction or overuse of medication, he nevertheless concluded from a health insurer report that some of the prescriptions he had written for her appeared to be too close together in time.

At the time of trial, Wife's stepfather was supervising Tammy's visits. Both Wife's mother and stepfather testified that they had never seen Wife behave inappropriately around the children. However, Wife's mother's testimony showed that she failed to appreciate the importance of the children's having possession of their phones to be able to contact their father and, together with her other testimony, could have indicated to the trial court that she was in denial about Wife's drug and behavior issues. Moreover, Wife's stepfather admitted that he had talked to Wife about her drug use in the past and confirmed that she had

been passed out one time when she had unsupervised possession of the girls and he had to come over.

We must be cognizant that the trial court is in a better position to decide issues within custody cases because "it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *M.M.M.*, 307 S.W.3d at 849 (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)); *see Newell*, 349 S.W.3d at 724 (Livingston, C.J., dissenting). An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence. *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding); *M.M.M.*, 307 S.W.3d at 849.

Here, as the trier of fact, the judge was not obligated to believe Wife's or her parents' testimony regarding her compliance with medication or her interaction with the children. The judge could have reasonably inferred that Wife's parents' testimony regarding her appropriate behavior during supervised visitation, and their lack of testimony regarding their familiarity with her behavior during unsupervised visitation (other than Wife's stepfather's acknowledgement that he knew she had passed out one time), strengthened a conclusion that supervised visitation was in Tammy's best interest. Additionally, the evidence of Wife's "doctor shopping," as well as her evasiveness in answering questions at trial, indicated a pattern of deceptive behavior that would have also justified a conclusion that her trial testimony lacked credibility. The evidence did not show that the effect on the children resulted solely from Wife's use of medication but

12

rather from her overuse and misuse of medication. Thus, we do not believe the trial court abused its discretion by ignoring the effect of Wife's physical condition in the evidence.[11]

Wife points generally to other cases in which courts have affirmed supervised visitation and claims her behavior is not as egregious as that of the parents in those cases. *See M.M.M.*, 307 S.W.3d at 853–54 (cited by Wife); *see also In re A.L.E.*, 279 S.W.3d 424 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (involving similar issue); *Ohendalski v. Ohendalski*, 203 S.W.3d 910 (Tex. App.—Beaumont 2006, no pet.) (same). But that is not the standard we must follow; a child's best interest is determined in each case according to its unique facts. *See Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). Accordingly, we conclude and hold that, based on all of the evidence presented in this bench trial, the trial court did not abuse its discretion by ordering that Wife's periods of possession and access with Tammy be supervised.

We overrule Wife's first issue.

---

[11]Moreover, if a parent's physical condition had enough of a serious, deleterious effect on a child, even through no fault of the parent, it is possible that it could be in that child's best interest that the parent be awarded only supervised visitation. *Cf. In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (explaining in the termination of parental rights context that not only are *Holley* factors not exhaustive, but not all factors must be proven for a fact finder to reasonably form a strong belief or conviction that termination is in a child's best interest).

## Property Division Issues

Wife's second through fourth issues challenge the trial court's property division.

### Valuation of Husband's Business

In her second issue, Wife contends that the trial court's finding that the value of Husband's business was $27,000 is not supported by sufficient evidence, resulting in an unequal property division.[12]

#### Testimony of Husband's Expert

Husband's expert, Bryan Rice, testified about his methodology for calculating the value of Husband's business. Rice explained that Husband is a financial advisor who holds two securities licenses. He sells customers financial services products and receives a commission on those sales from a broker-dealer. Husband pays a monthly fee to the broker-dealer for back office support and errors and omissions insurance. Although Husband's business is incorporated, Husband is a registered representative of the broker-dealer, or in Rice's words, a quasi-employee or independent contractor of the broker-dealer. Husband is responsible for cultivating his own clients and determining what services and products those clients need. According to Rice, the trust of

---

[12]Husband contends that Wife did not preserve this issue for review, but because Wife's challenges are to the legal and factual sufficiency of the trial court's findings of fact in a bench trial, they need not be preserved to be raised on appeal. Tex. R. App. P. 33.1(d); Tex. R. Civ. P. 324(a)–(b); *In re C.S.*, 208 S.W.3d 77, 82 n.12 (Tex. App.—Fort Worth 2006, pet. denied).

Husband's clients in his advice is important, which is one reason why it would be difficult to simply transfer Husband's clients to a different advisor or broker-dealer. Another reason is that Husband sells each client products based on their individual needs.

Rice's report was admitted into evidence. In it, he described the method he used to come to his conclusion:

> Under the income approach, any net profits, discretionary cash flows, cash distributions, or other measures of economic benefits paid from a company's portfolio of assets should be considered under an income-based method of valuation. The income approach serves to estimate value by considering the income (benefits) generated by the underlying assets over a period of time. This approach is based on the fundamental valuation principle that the value of a business is equal to the present worth of the future benefits that accrue to the ownership interest. The term income does not necessarily refer to income in the accounting sense but to future benefits accruing to the owner.
>
> . . . .
>
> Based on those facts and circumstances, it is my opinion, the estimated fair market value of the company is limited to the adjusted net book value of its assets as of the valuation. In other words, a hypothetical buyer of the company would not be able to rationalize paying more for it than the adjusted book value of its assets if [Husband] remained in competition with it since the buyer would have to compete for the existing client base with his unless he voluntarily signed a covenant not to compete. I can see no rational justification for [Husband] signing a non-compete for less than $500M to $720M since his average cash compensation from 2008-2011 from the company (taking into account pre-tax distributions and salary) was approximately $240,000. This $500M to $720M would be a proxy for the intangible value of [Husband's] personal goodwill based on the application of a method under the income or market approach and is comprised of 1.5 to three years of his total emolument from the practice. Additionally, [Husband] is a contract employee of SWS and his book is not portable. Finally, legal

15

standards in the State of Texas limit personal goodwill with respect to solo professional practices.

A discount for lack of marketability associated with a privately held business is applied to the value obtained by application of the income approach in the amount of 25%. In my opinion, this magnitude of discount is reasonable and appropriate for this type of business since the main asset is the ability to do business with the customers, which require a personal relationship between the working owner and the customers. Additionally, the asset base of the business is extremely limited, consisting only of the value that pertains to the customer relationships.

The income approach value is reduced to $443,200 after the application of a discount for lack of marketability. This value, when compared to the adjusted book value of $27,000 implies an unrecorded intangible asset in the amount of $416,000. In my opinion, 100% of this goodwill is allocable to the personal goodwill of [Husband] for the reasons set forth above.

Rice testified that in evaluating businesses in a divorce, it is important to determine how much of the business's goodwill is transferable to a buyer; professional practices are different from operating businesses, in which customers do not necessarily care who the owner is. In a professional practice, goodwill is "highly dependent upon the individual practitioner." Thus, Rice said that he thinks it is "virtually impossible" to transfer a professional's goodwill without the professional's agreeing not to compete. He further stated that in evaluating the value of a solo professional practice, he does not assess "any divisible goodwill" because "the relationship between the practitioner and the client is so strong and so paramount in driving the business." Rice defined goodwill as "the ability of a business to retain patronage after a change in ownership." According to Rice, if you buy a business and get to keep the

16

customers, you are buying commercial goodwill, but if you are not sure you get to keep the customers after buying the business, you will not pay for that goodwill, so it is personal.

In the context of Husband's business, Rice testified that "nobody would pay a penny more than the net assets of the business if [Husband] is not willing to sign a covenant not to compete." Because Husband has the clients, all of the goodwill is personal to him "because . . . without that person's involvement, without their time, toil, talent, skills, effort, and reputation, that business is not going to be there, and that's the essence of personal goodwill." Accordingly, Rice testified that in valuing Husband's business, he just "went straight to the net assets of the business as of . . . October 31," which he concluded was $27,000.

When asked about the structure of the business, Rice answered that he assumed Husband's business was incorporated and that Husband was an employee of the corporation. However, he also stated that regardless of how Husband's role was categorized, he gets his income by "serving clients."

**Testimony of Wife's Expert**

Wife's expert, James Francis, testified that he valued the business at $413,683 based on the "excess earnings" method of valuation, which he described as "a valuation method that considers both the tangible assets of the business, as well as the earnings capacity of the business, using a type of capitalized cash flow method." According to Francis, the courts and the IRS "have accepted [this method] for many years involving the valuation of small,

17

professional practices."  After applying that method, he also "applied some rule of thumb methods to determine the reasonableness of [his] conclusion" from a book called the Business Reference Guide.  In general, Francis was looking for the fair market value of business, in other words, not only what had happened recently in the business but also "what it looks like the business is going to continue to be doing."

Using the excess earnings method, Francis added the business's tangible assets, which consisted mostly of office furniture and equipment, to a weighted average net income of business (including Husband's salary), plus depreciation and interest.  Then he considered personal and business goodwill as follows:  he started with the return on the tangible assets from total earnings and then capitalized the result at 28.24 percent, which gave a value of intangible assets that "includes the business goodwill and the personal goodwill."  He explained,

> [I]f you're making extra money, excess earnings, that indicates that there is a business, there is a value, and then you have to figure what the risk is of a new owner, a willing buyer coming in, a willing seller walked away from it.  But there's a risk that you, as the new owner, you know for a fact, day one, you don't have that personal relationship with those customers, so you know you're going to lose some of that.
>
> What you're going to lose is . . . customers, because they don't know who you are; they don't hit it off with you.  Maybe you're not as personable as [Husband].  There's a risk involved in there.

He then went on to explain that there was "huge risk" in buying Husband's business without Husband's running it, which would decrease its value.  Francis estimated this "huge risk" at twenty-five percent of the calculated value.

18

According to Francis, this percentage—the only amount he attributed to personal goodwill—equaled what Rice initially deducted for lack of marketability in his calculation. Deducting this percentage from the capitalized net income and then adding back in the cost of the fixed assets, Francis's final calculation of the business value was $413,683.

Francis criticized Rice's conclusion that if the business were sold, there would be a risk that Husband would compete with it. He also criticized what he described as the "capitalized cash flow" method Rice used. According to Francis, Rice's deduction of twenty-five percent of the business's capitalized income for lack of marketability discount is the same thing as a deduction for personal goodwill; in effect, he claimed that Rice deducted personal goodwill twice. Although Francis testified that after the twenty-five percent deduction, all of the remaining estimated value was attributable to commercial goodwill, he never explained why. He also said that although Rice criticized the "asset approach" in his own report, he nevertheless must have employed it to come up with $27,000 as the value of the business.

Francis admitted on cross-examination that he did not discuss the structure of Husband's business with either Husband or his broker-dealer. However, he opined that the broker-dealer "does not own those clients. . . . [c]lients can't be owned." According to Francis, the book of business of those clients' money and the servicing of those clients constitutes "business goodwill," not commercial. However, he also admitted that if Husband got hit by a bus the

19

day of trial, all of those clients would be assigned to a new broker-dealer; he agreed that in that case, Husband "gets no trailers."[13] He admitted that a disinterested buyer of the business could not just find out Husband's clients' names without their permission, nor could such a buyer obtain those clients' business without them agreeing in advance to leave the business. Nevertheless, Francis claimed he would still value the business at $413,683 because "someone else could come in and . . . do a good job." He cited *Geesbreght v. Geesbreght*, 570 S.W.2d 427 (Tex. Civ. App.—Fort Worth 1978, writ dism'd), as supportive of his conclusion.

**Criticism of Excess Earnings Method Used by Wife's Expert**

Husband elicited testimony critical of the excess earnings method that Francis used. Rice testified that the IRS had criticized the method, which the IRS itself had created in the 1920s to value bootleg distilleries during prohibition. According to Rice, the IRS considers this method of calculation appropriate only if no other method would be appropriate and even then it is best to use only for a business with substantial tangible assets. *See* Rev. Ruling 68-609, 1968-2 C.B. 327, 1968 WL 15211, at *1–2 (Jan. 1, 1968) ("The 'formula' approach may be used in determining the fair market value of intangible assets of a business only if there is no better basis available for making the determination."). Rice said that

---

[13]Trailing commissions or fees are paid to advisors based on their clients' holdings. *See Beard v. Am. Exp. Fin. Advisors, Inc.*, No. 01-4030-CV-C-5, 2001 WL 1231003, at *1 (W.D. Mo. July 19, 2001).

the method used by Francis has also been criticized by the American Society of Appraisers. Rice testified that this method segregates the tangible versus intangible value of a business by calculating a perceived rate of return on the intangible value. But it is inappropriate for valuing Husband's business because it has almost no tangible assets and those it does have are not what materially produce the income. In a business like Husband's, it is his "clients, his expertise, and his knowledge" that produce the income.

Francis agreed on cross-examination that the IRS had published the following statements about the excess earnings method: (1) "the best you can hope for is to get a good answer based on two bad guesses," (2) "[i]t is impossible to derive two fairly accurate rates to use in the method," and (3) "[t]he use of the method has resulted in many improper appraisals." However, he nevertheless said that he testifies "quite often before the IRS," and it accepts this method "all the time." He explained on redirect how to overcome weaknesses in the excess earnings method:

> Because in the excess earnings method, the IRS did not tell you what factors to use. Where I used the 48 percent and the 28 percent and where I used the -- I believe I used 7 1/2 percent on fixed assets, in the actual memorandum, where the IRS tells you how to use the excess earnings method, they didn't tell you what to use, so people use all sorts of different numbers. That's why what I did was I went to the Ibbotson's report, which has the effect of making the excess earnings method be more similar to the capitalized cash method that -- capitalized earnings method that Mr. Rice used.

**Applicable Law**

In terms of valuation, there is a distinction between the goodwill that attaches to a professional person because of confidence in that individual's skill and ability and the commercial goodwill of a business that arises from its location, its well-established and well-recognized name, or something that otherwise separates it "from the skills or attributes of an individual member." *Salinas v. Rafati*, 948 S.W.2d 286, 290–91 (Tex. 1997); *Hill v. Hill*, No. 02-12-00332-CV, 2014 WL 92795, at *5 (Tex. App.—Fort Worth Jan. 9, 2014, no pet.) (mem. op.). Only "[g]ood will that exists separate and apart from a professional's personal skills, ability, and reputation is divisible upon divorce." *Hill*, 2014 WL 92795, at *5; *Keith v. Keith*, 763 S.W.2d 950, 952 (Tex. App.—Fort Worth 1989, no writ). To determine whether goodwill that is subject to division upon divorce attaches to a professional practice, goodwill first must be determined to exist independently of the personal ability of the professional spouse, and then if such goodwill is found to exist, the court must determine whether that goodwill has a commercial value in which the community estate is entitled to share. *Hill*, 2014 WL 92795, at *6; *Von Hohn v. Von Hohn*, 260 S.W.3d 631, 638 (Tex. App.—Tyler 2008, no pet.).

The supreme court has described the *Geesbreght* holding as follows:

> [In] *Geesbreght v. Geesbreght*, . . . a physician owned shares in a professional corporation that provided emergency-room physicians to hospitals. The corporation had contracts with several hospitals and employed about fifty to one hundred physicians on a part-time basis and ten on a full-time basis to satisfy those contracts. The

22

court of appeals drew a distinction between the goodwill built up by the physician personally at the hospital at which he practiced and the corporation's goodwill arising from the opportunity under its contracts to provide service to other hospitals at which he did not practice. The court of appeals reasoned that if the physician and other shareholders sold the corporation, the right to do business as that corporation would continue and the goodwill built up by the company would continue for a time.

The ultimate holding in *Geesbreght* was that the corporation had goodwill separate and apart from that of the physician as a professional practitioner. The goodwill of the company, apart from the goodwill associated with the physician himself, could be considered in dividing the community estate upon divorce.

*Salinas*, 948 S.W.2d at 291 (citations omitted).

**Evidence Supports Valuation of Husband's Expert**

The litigation of this issue involved a classic battle of the experts. In a battle of competing expert testimony, it is the sole prerogative of the fact finder to determine the weight and credibility of the witnesses, the obligation of the respective advocates to persuade them, and "our obligation to see that the process was fair and carried out according to the rules." *Welch v. McLean*, 191 S.W.3d 147, 160 (Tex. App.—Fort Worth 2005, no pet.) (op. on reh'g) (quoting *Cruz ex rel. Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 646 (Tex. App.—El Paso 2001, pet. denied)), *overruled on other grounds by Phillips v. Bramlett*, 288 S.W.3d 876 (Tex. 2009). Wife did not and has not challenged Rice's qualifications or reliability, only the legal and factual sufficiency of the evidence to support his opinion.

23

As set forth above, ample evidence supports the trial court's decision to value Husband's business in the amount opined to by Rice. Rice explained not only the method he used, but also the problems with the method used by Francis, and he relied correctly on Texas law concerning personal goodwill. Although Francis faulted Rice for discounting for personal goodwill twice, he never explained how any commercial goodwill could be attributed to the business "separate and apart from that . . . as a professional practitioner." *Salinas*, 948 S.W.2d at 291.

Wife contends that Rice's $27,000 valuation was merely conclusory; however, Rice explained more than once how he came to the conclusion that all of the goodwill attached to the business was personal, a conclusion that was based on his application of Texas law to the facts of the case. Thus, his opinion was not conclusory. *See Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 114 (Tex. App.—San Antonio 2011, pet. denied).

Here, Husband's expert testified that all of the goodwill was personal, and he discredited the method by which Wife's expert determined that much of the business's goodwill was commercial. Wife's expert testified that some of the goodwill was personal and some of it was commercial. We conclude and hold, under the applicable standard of review, that legally and factually sufficient evidence supports the trial court's finding that the business was valued at $27,000 as testified to by Husband's expert.

Accordingly, we overrule Wife's second issue.

## Deferred Compensation Account Award for Children's Benefit and Unequal Property Division

In her third issue, Wife challenges the trial court's award of Husband's deferred compensation account to Husband to be used solely for the children's college education.  In her fourth issue, she generally challenges the fairness of the property division.

The community property consisted mostly of debt; there were four main assets that were awarded:  Husband's business, the former marital residence, a car,[14] and Husband's deferred compensation account.  The trial court awarded Wife the car and Husband the business, and the parties agreed that the house would be awarded to Husband so that he could sell it and repay the IRS past due amounts owed by the community.  But the trial court found that the deferred compensation account—which Husband admitted contained community funds— was a gift to the children; thus, the trial court awarded Husband control of the account to be used solely for the children's college educations.  The trial court also apportioned the community's debt.  Wife contends that the trial court's mischaracterization of the deferred compensation account as a gift to the children resulted in her receiving a disproportionate amount of the community's debt.

---

[14]Husband's car was owned by his business, and Rice included its value in his calculation of the business's assets.

**Applicable Law**

In dividing the community estate of the parties, the trial court must order a division of the property that it deems just and right, having due regard for the rights of each party. Tex. Fam. Code Ann. § 7.001 (West 2006). A trial court has broad discretion in dividing the marital estate, and we presume the trial court exercised its discretion properly. *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981); *Barnard v. Barnard*, 133 S.W.3d 782, 787 (Tex. App.—Fort Worth 2004, pet. denied). Although the trial court's discretion to divide the community estate is broad, it is not without limits. *Barnard*, 133 S.W.3d at 787; *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.). The division of the community estate need not be equal, but it should be equitable. *Barnard*, 133 S.W.3d at 787; *O'Carolan*, 71 S.W.3d at 532. The trial court must have some reasonable basis for an unequal division of property. *Barnard*, 133 S.W.3d at 787; *O'Carolan*, 71 S.W.3d at 532. To prove that the trial court abused its discretion in dividing the community estate, the complaining party must demonstrate from evidence in the record that the division was manifestly unjust and unfair. *Barnard*, 133 S.W.3d at 787; *Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied) (op. on reh'g).

**No Evidence That Parties Intended Deferred Compensation Account to be a Gift to the Children**

The trial court found that the parties had made a gift of the deferred compensation account to the children to be used for their college educations.

26

However, to be a gift, a party must make an "*immediate* and *unconditional* divestiture of . . . ownership interests and an immediate and unconditional vesting of such interests in the donee." *Gomer v. Davis*, 419 S.W.3d 470, 476 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (*citing Nipp v. Broumley*, 285 S.W.3d 552, 559 (Tex. App.—Waco 2009, no pet.); *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.)); *Thompson v. Dart*, 746 S.W.2d 821, 825 (Tex. App.—San Antonio 1988, no writ) ("All dominion and control over the property must be released by the owner."). Here, although Husband testified that he set up the deferred compensation account for the purpose of paying for the children's college educations, the evidence showed that the account was still in Husband's name and that future distributions would be made to Husband. Accordingly, the evidence does not show a divestiture of ownership that would support the trial court's finding that the parties had made a present gift of the account to the children.[15] We conclude and hold that the trial court erred by finding that the deferred compensation account was a gift to the children, and we sustain Wife's third issue.

---

[15]Neither could the account be awarded as child support. The duty to support a child does not extend to a post-secondary education. *See* Tex. Fam. Code Ann. § 154.001(a)(1) (West 2014); *Woodruff v. Woodruff*, 487 S.W.2d 791, 793 (Tex. Civ. App.—Texarkana 1972, no writ) (op. on reh'g) ("A college or university education is not a general necessity, but is a special advantage.").

27

**Taking Deferred Compensation Account Into Consideration, Property Division is Unequal**

The chart below shows the values of the property awarded and the amount of debt assigned to each party in the decree.[16]

| Property | Wife | Husband |
|---|---|---|
|  |  |  |
| Debt | ($291,524.77) | ($429,681)[17] (includes mortgage and property taxes on house and federal income taxes)[18] |
| Car | $14,850 |  |
| Household furnishings | All of the community property household furnishings |  |
| Former residence |  | $225,000 |
| Deferred compensation account |  | $132,332 (value when decree was signed) |

---

[16]Because we have already held that the evidence supports the valuation of the business at $27,000, we will consider that value in determining whether the trial court's division of the community property was just and right. Wife did not otherwise challenge Husband's evidence showing the valuation of debt and assets upon which the trial court's property division was based.

[17]Husband includes $49,269 in bank loans in the calculation of debt in his brief, but Husband testified at trial that this debt was paid off in May 2013, a month before trial. Therefore, we did not include it in our calculation. Our calculation is based on the debts specifically enumerated in the decree, plus undisputed expenses listed in Husband's Exhibit 8 and generally described in the decree: $2,514 in property taxes, $11,250 in estimated real estate commissions, and $154,024 still owed on the mortgage.

[18]The decree listed the federal income taxes owed as $103,021 for years prior to 2013 and an additional $30,000 for 2013. But Husband's exhibit listing the taxes owed showed that a total of $103,021 was owed for 2010–2013 taxes. Therefore, we used the $103,021 in calculating the total debt assigned to Husband.

| | | $100,000 (approximate value after taxes withheld at the time of yearly disbursements) |
|---|---|---|
| IRA | | $1,280 |
| Business | | $27,000 |
| Total net debt assigned | ($276,674.77) | ($44,069) (with current value of deferred compensation account)<br><br>($76,401) (if post-tax-withholding value considered) |

As can be seen above, considering the deferred compensation account as part of the community estate—even at its after-tax value—the trial court's property distribution was unequal. Although the trial court determined that Husband's separate property estate was entitled to reimbursement of $85,000 for money used for a down payment on, and improvements to, the former residence—and took that amount into consideration in determining the property division—the proper measure of reimbursement is the enhancement value to the benefitted estate. *Zeptner v. Zeptner*, 111 S.W.3d 727, 735 (Tex. App.—Fort Worth 2003, no pet.) (op. on reh'g). The enhanced value is the difference between the fair market value of the benefitted estate before the payment of debt and making of improvements and the fair market value afterward, not the cost of the payment or improvements. *Anderson v. Gilliland*, 684 S.W.2d 673, 675 (Tex. 1985); *Sharp v. Stacy*, 535 S.W.2d 345, 351 (Tex. 1976); *Nelson v. Nelson*, 193 S.W.3d 624, 633 (Tex. App.—Eastland 2006, no pet.). Husband presented no

evidence of the enhanced value of the residence; thus, the trial court erred by considering the $85,000 in the property division, and we do not consider it in our review of the equitability of the division. Moreover, even if the $85,000 were to be credited to Wife's balance of the debt (because Husband asked the trial court to consider the $85,000 in the division of the debt rather than award him a judgment for that amount), the division is unequal; even with the credit, Wife's total debt would be $191,674.77 compared to Husband's $76,401.

Therefore, we must decide if such an unequal property division was within the trial court's discretion.

**Unequal Division Reasonable But Ultimately Inequitable**

Husband first contends that Wife invited any error in the property division by agreeing that he should be awarded the house and by asking the trial court to apportion to her the debt set forth in the decree. However, even though the decree notes the parties' agreement that the house would be awarded to Husband so that he could borrow money to pay off IRS debt, and even though Wife agreed that her own postseparation debt should be attributed to her, she asked the trial court to consider those debts when determining whether there was "any opportunity to pay [her] any cash" from the deferred compensation account, the only remaining semi-liquid asset available to the parties. Accordingly, we do not agree that Wife invited any claimed error in the property division by asking for the debt that was apportioned to her in the decree when what she is complaining about on appeal is the trial court's not awarding her enough assets to repay her

30

share of the debt. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) ("[T]he invited error doctrine is inapplicable to this case because Union Gas did not request that the trial court rule in the manner in which it did.").

Factors to consider in determining whether an unequal division of the community estate is equitable include the parties' capacities and abilities, benefits the party not at fault would have derived from continuation of the marriage, business opportunities, education, the parties' physical conditions, the parties' financial conditions and obligations, the size of the separate estates, the nature of the property, and disparities in earning capacities and incomes. *Murff*, 615 S.W.2d at 699; *Palaez v. Juarez*, No. 04-14-00022-CV, 2014 WL 7183483, at *5 (Tex. App.—San Antonio Dec. 17, 2014, pet. denied) (mem. op.). In addition, a court may consider one spouse's wrongful dissipation of community assets. *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998); *Bishop v. Bishop*, No. 14-02-00132-CV, 2003 WL 21229476, at *4 (Tex. App.—Houston [14th Dist.] May 29, 2003, no pet.) (mem. op.). The circumstances of each marriage dictate what factors should be considered in division of the marital estate. *Young v. Young*, 609 S.W.2d 758, 761 (Tex. 1980); *Palaez*, 2014 WL 7183483, at *5.

It is undisputed that by virtue of his established business and the fact that Husband and Wife agreed that Wife would not work during the marriage so that she could raise the children, Husband had a greater current earning capacity than Wife at the time of trial. The trial court calculated Wife's earning capacity for

31

purposes of assessing child support to be minimum wage. It is also undisputed that Wife has numerous physical impairments that cause her chronic pain. Wife introduced evidence that a state agency had determined in March 2011 that she was disabled and that the Social Security Administration was investigating whether she was eligible for benefits. She testified that her benefits would be approximately $660 per month once she had established eligibility.

While Wife contends that the evidence shows she is completely unable to work due to her disability, Husband presented evidence from the family physician that when he was seeing her in 2010, Wife would have been able to do at least some work but for her overuse of pain medication. Husband also presented evidence that during the divorce proceedings, Wife was able to travel, play volleyball with Tammy, and make and sell wreaths.[19] He further presented evidence that Wife had been able to sweep a gymnasium floor. Wife noted that just because she can do certain things some days does not mean she can do the same things on days when she is experiencing fatigue and pain. Wife has a four-year college degree and before the children were born, she worked in pharmaceutical sales. The trial court specifically found that Wife's "drug addiction and issues significantly contribute to her lack of ability to be employed."

There was also evidence that Wife intentionally lived beyond her means after the parties separated. For example, Husband testified that she moved out

---

[19]This evidence is from Facebook communication from Wife to Lauren, claiming that she had made $400 in one hour for making two wreaths.

32

of the former marital residence, on which he had continued to pay the mortgage, and rented a 2,100 to 2,200 square foot home for $1,500 per month.[20]  When Husband cleaned the former residence after Wife moved out, in addition to pills and marijuana, he found a receipt from Neiman Marcus for a $150 tube of mascara.  Additionally, there was evidence that Husband had paid at least $200,000 in three years towards Wife's post-separation expenses and trial court-ordered temporary spousal support.  The trial court could have concluded from the evidence that a large amount of the community's debt was attributable to Wife's prescription drug addiction and her living beyond the community's means while not attempting to get even a minimum wage job.[21]

---

[20]Although the parties' residence had been listed, it had not sold by the time of trial.

[21]When asked about his concerns about awarding Wife money, Husband testified:

> The issue is this:  We've paid [her] 200-and-something thousand dollars in three years, and she's no better off than she was when she started.  We could pay her $200,000 for the next three or the next ten or the next twenty, and her sole motivation is she does not want to go get a job.  And this is where we have problems, because this disability that she claims is incredibly selective.  She's able to go and do and visit Palm Springs and Pebble Beach and Denver at will, yet she will not go get a job somewhere.
>
> And she came up to me and said -- I told her in October of 2010, I said, ". . . , we have to slow down.  I'm having to pay 26,000 to the IRS this month."  And she looked at me and she said, "Looks like you need to work a little harder."  And I said, "Well, maybe you could get a job."  And she laughed with this fake laugh and goes, "Ha, ha, ha, that'll never happen."  So she has no desire to work whatsoever.

33

Husband had primary responsibility for Tammy's living expenses and was ordered in the decree to pay, as a child support obligation, "health insurance for each child . . . that covers basic health-care services," which the trial court determined that Husband could purchase at $412 per month. *See Young*, 609 S.W.2d at 760–61 (noting that trial court can consider which party has primary responsibility for care of children in determining just and right division); *Gordon v. Gordon*, No. 14-10-01031-CV, 2011 WL 5926723, at *7 (Tex. App.—Houston [14th Dist.] Nov. 29, 2011, no pet.) (mem. op.) (noting in discussion of support for inequitable division that wife was named managing conservator of children). Yet, even though the trial court awarded the deferred compensation account to Husband, it restricted the use of the funds in the account, so the trial court could have considered that Husband would not have those funds available for living expenses. The trial court could have likewise considered to some extent Husband's uncontroverted testimony that Wife retained possession of all of the community furnishings and personal property from their former home.

Based on the evidence, we conclude and hold that the evidence supports an unequal property division. However, based on the chart above, depending on which value is used for the deferred compensation account, Wife's share of the debt is between 86 to 76 percent of the community estate, which has a negative total net worth. Even considering that the trial court awarded her a year's spousal maintenance—presumably to give her time to work out her drug issues and attempt to find steady-paying work—the evidence does not justify awarding

34

such an extremely disproportionate amount of the debt to Wife while awarding Husband all of the assets that could potentially be used to pay off debt.

Although we believe the evidence justifies an unequal division, we nevertheless conclude and hold that the trial court abused its discretion in failing to award Wife any of the value of the deferred compensation account resulting in an inordinately one-sided division of the debt.[22]  We therefore sustain Wife's fourth issue.

## Spousal Maintenance Issues

In her fifth issue,[23] Wife contends that the trial court abused its discretion by awarding her spousal maintenance of only $1,250 per month for one year after the divorce.  In her sixth issue, she complains about the trial court's awarding child support to Husband in the amount of $262.88 per month. Because she argues these issues together, we address them together as well.

---

[22]Husband alternatively asked the trial court, if it did not order the deferred compensation account to be used for the girls' college educations, to order it applied to repayment of the debts.  Because we must remand for a new property division, and because Husband does not raise this alternative argument on appeal, we need not address it.  *See* Tex. R. App. P. 47.1.

[23]Although we must remand for a new property division in light of our disposition of this issue, we nevertheless address the other property-related issues because it is probable they will be relitigated.  *See Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex. 1997); *State v. Little Elm Plaza, Ltd.*, No. 02-11-00037-CV, 2012 WL 5258695, at *15 n.17 (Tex. App.—Fort Worth Oct. 25, 2012, pet. dism'd) (mem. op.).

**Applicable Law – Spousal Maintenance**

The award of spousal maintenance is controlled by the version of section 8 of subchapter B of the family code in effect before the legislature amended it in 2011.  Act of May 18, 2011, 82nd Leg., R.S., ch. 486, § 10(a), 2011 Tex. Sess. Law Serv. 1239, 1243.  The former version of section 8.051 provided that spousal maintenance could be awarded if the spouse of a ten-year or longer marriage lacked sufficient property to meet minimum reasonable needs and was either (a) "unable to support himself or herself through appropriate employment because of an incapacitating physical or mental disability" or (b) "clearly lack[ed] earning ability in the labor market adequate to provide support for the spouse's minimum reasonable needs, as limited by Section 8.005."  Act of April 3, 1997, 75th Leg., R.S., ch. 7, § 1, sec. 8.002(2)(A), (C), 1997 Tex. Gen. Laws 8, 34–35 (renumbered 2001 and amended 2011) (current version at Tex. Fam. Code Ann. § 8.051(2)(A)–(B) (West Supp. 2014)); *see Slicker v. Slicker*, No. 05-13-01762-CV, 2015 WL 2407814, at *6 (Tex. App.—Dallas May 21, 2015, no pet.); *Pickens v. Pickens*, 62 S.W.3d 212, 215 (Tex. App.—Dallas 2001, pet. denied).  Former section 8.053 set forth a presumption that maintenance was not warranted unless the spouse had been diligent in seeking suitable employment or developing skills necessary to become self-supporting during separation and the time the divorce was pending.  Act of May 25, 2005, 79th Leg., R.S., ch. 914, § 2, 2005 Tex. Gen. Laws 3146, 3146–47 (amended 2011) (current version at Tex. Fam. Code Ann. § 8.053(a) (West Supp. 2014)); *Pickens*, 62 S.W.3d at 215.

However, this presumption did not apply to a person eligible for spousal maintenance because of an incapacitating physical or mental disability. Act of May 25, 2005, 79th Leg., R.S., ch. 914, § 2, 2005 Tex. Gen. Laws 3146, 3147, *repealed by* Act of May 18, 2011, 82nd Leg., R.S., ch. 486, § 9(1), 2011 Tex. Sess. Law Serv. 1239, 1242.

By awarding spousal maintenance, the trial court implicitly found that Wife lacked sufficient property to meet minimum reasonable needs. Moreover, the trial court implicitly found either (a) that she presented evidence sufficient to overcome the presumption that she had been diligent in seeking suitable employment or developing skills necessary to become self-supporting during separation and the time the divorce was pending or (b) that she had an incapacitating physical or mental disability. A finding that maintenance was warranted under (a) would be inconsistent with the trial court's written finding that Wife was capable of doing some work, as well as the evidence that Wife had yet to look for or find a job. Moreover, another of the trial court's written findings is more consistent with (b): that Wife's "drug addiction and issues significantly contribute to her *lack of ability* to be employed." [Emphasis added.] Accordingly, it appears that the trial court awarded maintenance to Wife because she lacked property sufficient to meet her needs and that she had at least a temporary disability because of her drug addiction. *See, e.g.*, *O'Carolan v. Hopper*, 414 S.W.3d 288, 309–10 (Tex. App. Austin 2013, no pet.) (op. on reh'g); *Novick v. Shervin*, 412 S.W.3d 825, 829–32 (Tex. App.—Dallas 2013, no pet.).

37

The factors to be considered in determining the "nature, amount, duration, and manner" of spousal maintenance were (1) the spouse's financial resources on dissolution of the marriage, (2) the availability and feasibility of the education or training necessary to enable the spouse to earn sufficient income, (3) the duration of the marriage, (4) the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance, (5) the ability of the spouse from whom maintenance is requested to meet his or her personal needs while providing other support, (6) "acts by either spouse resulting in excessive or abnormal expenditures or destruction, concealment, or fraudulent disposition of community property," (7) the comparative financial resources of the spouses, including medical, retirement, insurance, or other benefits, (8) the spouse's contribution as a homemaker, or to the other spouse's education, training, or increased earning power, (9) the property brought to the marriage by either spouse, (10) marital misconduct of the spouse seeking maintenance, and (11) the effort of the spouse seeking maintenance to pursue available employment counseling. Act of April 3, 1997, 75th Leg., R.S., ch. 7, § 1, sec. 8.003, 1997 Tex. Gen. Laws 8, 35 (renumbered 2001 and amended 2011) (current version at Tex. Fam. Code Ann. § 8.052 (West Supp. 2014)). The term "minimum reasonable needs" is not defined in the family code. *See Diaz v. Diaz*, 350 S.W.3d 251, 254 (Tex. App.—El Paso 2011, pet. denied) (op. on reh'g); *Cooper v. Cooper*, 176 S.W.3d 62, 64 (Tex. App.—Houston [1st Dist.] 2004, no pet.). A trial court determines whether a party's minimum reasonable needs are

38

met on a fact-specific, individualized, case-by-case basis. *Slicker*, 2015 WL 2407814, at *6. Under the prior version of section 8.054, absent a continuing incapacitating physical or mental incapacity, spousal maintenance could last no longer than three years and had to be limited in duration to the shortest reasonable period that would allow the spouse seeking maintenance to meet the spouse's minimum reasonable needs by obtaining appropriate employment or developing an appropriate skill. Act of April 3, 1997, 75th Leg., R.S., ch. 7, § 1, sec. 8.005, 1997 Tex. Gen. Laws 8, 35–36 (renumbered 2001 and amended 2005, 2011) (current version at Tex. Fam. Code Ann. § 8.054(a)–(b) (West Supp. 2014)).

Spousal maintenance is intended to provide temporary and rehabilitative support for a spouse whose ability for self-support has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support. *O'Carolan*, 71 S.W.3d at 533. An award of spousal maintenance is reviewed for abuse of discretion, just as child support awards are reviewed for abuse of discretion. *Brooks v. Brooks*, 257 S.W.3d 418, 425 (Tex. App.—Fort Worth 2008, pet. denied).

**Analysis**

Wife contends that not only is the trial court's award of spousal maintenance insufficient to provide for her monthly expenses, it is further eroded by the monthly child support the trial court ordered her to pay.

39

The trial court's award of spousal maintenance amounted to $1,250 per month. Although Wife testified that her monthly expenses were upward of $14,000 and that this amount would not even cover her monthly rent, Husband presented credible evidence that Wife spent beyond her means and that he had paid over $200,000 in temporary spousal support while the divorce was pending. There is no requirement that an award of spousal maintenance eliminate a shortfall between monthly income and expenses. *Tellez v. Tellez*, 345 S.W.3d 689, 692 (Tex. App.—Dallas 2011, no pet.).

On the other hand, when the award of child support is considered, the trial court awarded Wife less than $1,000 per month. Although the trial court's award of child support was within its discretion and appears to be reasonable considering that Husband would have primary responsibility for Tammy's living and medical expenses, the trial judge's comments at trial indicated that he did not believe Wife would ever pay child support that was ordered: "I understand that child support is not going to be paid, but child support needs to be mentioned in the decree." And in arguing against an award of spousal maintenance, Husband argued,

> In this case, we have a mom who does not have custody of the children. He has custody of the children. He's the one that's not getting child support from her. You take out the fact that she's not paying support. *We're not even asking for child support. She can't pay it. We're not even asking her to pay it.* But that should be taken into consideration. [Emphasis added.]

40

It appears that the trial court—in awarding Husband the total amount of the deferred compensation account but restricting it for the children's education, awarding Wife spousal maintenance but for a limited time and in a limited amount, and providing that Wife be held to a child support obligation based on minimum wage—may have been attempting to give Wife time to work out her drug issues and find steady work while at the same time providing for the needs of the children and the minimum needs of Wife in a way that would minimize Wife's unfettered access to funds that she could potentially mismanage, as evidenced by her spending issues during the divorce. However, the award of child support based on minimum wage earnings is inconsistent with a conclusion that Wife had at least a temporary disability warranting the payment of spousal maintenance for one year.

Because the comparative resources of the spouses, including the division of the community estate, are to be considered in the award of spousal maintenance, because we must remand for a new property division, and because the trial court's findings vis-a-vis spousal maintenance and child support are inconsistent, we conclude and hold that the trial court's order should be reversed as to the spousal maintenance and child support as well so that the trial court can consider all of these issues together. *See O'Carolan*, 71 S.W.3d at 534–35 (holding that trial court abused its discretion by awarding spousal maintenance in lieu of making equitable division of community estate); *In re Marriage of Combs*,

41

958 S.W.2d 848, 851 (Tex. App.—Amarillo 1997, no pet.). We sustain Wife's fifth and sixth issues.

## Conclusion

Having sustained Wife's fourth through sixth issues, we reverse the trial court's property division, award of spousal maintenance to Wife, and award of child support to Husband and remand this case to the trial court for a retrial on those issues. Having overruled Wife's remaining issues, we affirm the trial court's ruling on the SAPCR.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

GABRIEL, J., filed a concurring and dissenting opinion.

DELIVERED: August 13, 2015